**FAUSEK et al. v. VINCENT.**

Patent Appeal No. 3870.

Court of Customs and Patent Appeals.
Dec. 6, 1937.

Edward M. Harrington, of St. Louis, Mo., for appellants.

Usina & Rauber, of New York City (Benjamin T. Rauber and D. A. Usina, both of New York City, and E. W. Shepard, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT Associate Judge.

This is an interference proceeding in which there has been brought before us for review a decision of the Board of Appeals of the United States Patent Office, affirming a decision of the Examiner of Interferences awarding priority of invention to appellee upon the single count in issue.

The interference involves an application of appellants, filed on November 28, 1930, Serial No. 498,610, and an application of appellee filed on January 29, 1932,

Serial No. 589,720. Appellee being the junior party, the burden was upon him to establish priority of invention by a preponderance of evidence.

The count reads as follows:

"1. A pressure regulator comprising a nozzle having a duct extending therethrough for the passage of high pressure fluid, a disc coacting with said nozzle, the disc and nozzle being movable relatively to one another and jointly controlling the flow of fluid through said duct, a stem extending through and projecting beyond the ends of said nozzle, said stem having an imperforate head coacting with a seat formed in the nozzle and having a part normally resting on the disc and holding the head out of contact with said seat."

The subject-matter of the involved invention is well described in appellants' brief as follows:

"The invention involved in this interference concerns a pressure regulator, or pressure-reducing valve, which is provided with a nozzle having a passageway formed therethrough for entry of fluid into the body of the regulator. A closure element arranged for movement with respect to the discharge end of the nozzle coacts with said discharge end of the nozzle in a manner to control and regulate the flow of fluid from the nozzle, and a check valve which includes an imperforate head movable with respect to a seat is located within the passageway formed within the nozzle. The check valve includes also a stem that contacts with the closure element, so that said closure element and said check valve move in an opposite manner in consonance with each other, the head of the check valve moving toward its seat when the closure element moves in a direction away from the discharge end of the nozzle, and the head of the check valve moving in a direction away from its seat when the closure element moves toward its seated position in contact with the discharge end of the nozzle.

"The purpose of providing the regulator with the check valve is to prevent a sudden rush of high pressure fluid into the regulator at a time when the closure element is spaced a considerable distance from the discharge end of the nozzle, or when the seat of the closure element has been destroyed. * * *"

As originally declared, the interference embraced three counts, numbered 1, 2, and 3.

Both parties filed preliminary statements. Appellants alleged conception of the invention and its disclosure to others in July, 1923, and reduction to practice in October, 1923.

Appellee alleged conception of the invention on or about January 21, 1928, and disclosure to others and reduction to practice on or about February 4, 1928.

Following the filing of the preliminary statements, appellee moved to dissolve the interference with respect to counts 2 and 3 upon the ground that they were not supported by appellants' application, and appellants moved to dissolve the interference as to all of the counts upon the ground that they are unpatentable over the disclosure in a patent, No. 1,638,010, issued to appellants on August 9, 1927.

The motion of appellee to dissolve the interference as to counts 2 and 3 was granted, and the motion of appellants to dissolve the interference as to all of the counts was denied by the Examiner of Interferences.

After certain other interlocutory proceedings immaterial here, the interference proceeded with count 1, hereinbefore quoted, as the sole issue.

Both parties took testimony. The Examiner of Interferences held that the evidence established that appellee conceived the invention and reduced it to practice on February 4, 1928; that the evidence established conception of the invention by appellants in 1923, but failed to establish actual reduction to practice at any time; that appellants were entitled only to a constructive reduction to practice as of their filing date, November 28, 1930; and that they were not diligent in reducing the invention to practice from immediately prior to the entry of appellee into the field, viz., February 4, 1928, to November 28, 1930, appellants' filing date. For these reasons he awarded priority of invention upon the count to appellee.

Appeal having been taken, the Board of Appeals, after reviewing the evidence in the case at length, stated that it was in substantial agreement with the findings of the Examiner of Interferences, and affirmed his decision awarding priority of invention to appellee.

From this decision of the board appellants have taken this appeal.

Before us appellants make two contentions:

1. That the subject-matter of the count is not patentable to either of the parties.

2. That, if the counts are patentable, priority of invention, upon the evidence in the case, should be awarded to appellants.

■ With respect to the first contention, it is well established that the question of patentability of counts will not be considered by the court on appeal in an interference proceeding. Stern et al. v. Schroeder et al., 36 F.2d 515, 17 C.C.P.A. (Patents) 670; Deibel v. Heise & Schumacher, 46 F.2d 570, 18 C.C.P.A. (Patents) 907.

Upon the question of the preponderance of the evidence respecting priority of invention, both of the Patent Office tribunals, as hereinbefore noted, awarded to appellee the date of February 4, 1928, for conception and reduction to practice of the invention. The testimony on behalf of appellee clearly establishes this date, unless the testimony of appellee and his corroborating witnesses be disregarded upon the ground that it is so contradictory that it should have no probative force, as urged by appellants.

We find nothing in said testimony to indicate that any of appellee's witnesses, or appellee himself, testified willfully falsely, and there is no disagreement among them as to the date of reduction to practice by appellee of the invention, viz., February 4, 1928. Inasmuch as no date earlier than February 4, 1928, was awarded to appellee for conception of the invention, any conflict in the testimony relating to conception prior to said date is immaterial, and we find no error in the finding of the Board of Appeals that appellee is entitled to said date for conception, and also for reduction to practice of the invention.

We next come to the consideration of the evidence in behalf of appellants respecting priority of invention. One of appellants' contentions is that a patent issued to them on August 9, 1927, No. 1,-638,010, which patent was offered in evidence, constituted a constructive reduction to practice of the invention here involved. It is true that said patent embraces some of the same subject-matter here involved, but it does not disclose the element of the count before us reading " * * * said stem having an imperforate head * * *."

The effect of appellants' contention is that an express limitation in the count should be ignored upon the ground that the count is not patentable in view of the patent issued to appellants.

■ The rule is so well established as to require no citation of authority that in an interference proceeding express limitations in a count may not be disregarded. This being true, it is obvious that appellants' patent, inasmuch as it does not disclose one of the positive limitations in the count, cannot be regarded as a reduction to practice of the invention here involved.

Appellants' next contention is that the proof establishes that they were the first to conceive the invention, and that they actually reduced it to practice before appellee entered the field.

It appears from the evidence in the record that the appellants are copartners doing business under the name of "Modern Engineering Company," and that the copartnership was, during the period material here, and had been for many years prior to. said period, the manufacturer of various articles, among which were pressure regulators or reducing valves.

The appellants testified that they first conceived the involved invention about July, 1923, and that a model of the regulator embodying the invention was constructed and tested in October, 1923. This is corroborated by appellants' witness Keane. The model so tested had a stem with an imperforate head, as called for by the count. The model in question was not offered in evidence, the statement being made that it had been lost.

With respect to this test, the appellant Irwing F. Fausek testified in part as follows:

"Q. 32. Did the original conception of the invention of yourself and your co-inventor include the bleeding port as shown on the drawing identified as Fausek and Fausek Exhibit No. 1? A. No, it did not.

"Q. 33. When was the decision made to provide the check valve with a bleeding port? A. After watching the operation of the first model.

"Q. 34. What occasioned the decision to add a bleeding port in the check valve? A. The original construction offered a serious objection in that, if the regulator were taken off of an empty tank and applied to a full tank—which is very frequently the case—and the adjusting

screw of the regulator were left screwed in, the check valve would then be in a closed position and no oxygen would come through the regulator. In order to make the regulator function it would first be necessary to release the adjusting screw. We felt that this would offer a serious objection, on the part of some operators, and might cause undue sales resistance. We, therefore, set about to scheme a way of getting away from it.

"Q. 35. Did the regulator operate in an entirely satisfactory manner, aside from what you have stated, without the bleeding port? A. Of course, it also presented the objection that most of the check valves which we made were not absolutely tight, allowing a very slight leakage, which pressure would build up on the low pressure side of the regulator, to a point where they would equalize the pressure of the compression spring against the diaphragm, when the seat of the regulator would then move up against the nozzle and open the check valve. This took place rather rapidly and caused a slight noise, which might also be considered objectionable."

With respect to the test the witness Keane stated, referring to the first model constructed: "* * * Just after I saw this drawing—and we looked at it several nights in succession here—we made up a model. It was completed by us thirty days afterwards, and then A. J. tried it down there. It was supposed to work perfectly and when he tried it down there he couldn't get it opened; it would not open up. If it would open up it would come open too easy, it would cause a lot of wobble. Then after that, I guess, was when he changed it." ·

·We would observe that it appears that the term "bleeding port" used by the witnesses refers to the perforate head of the valve stem.

Following this test, the device was changed by providing a perforate head of the valve stem, and in November, 1923, application was made for the patent hereinbefore referred to, in which the regulator was provided with a perforate head of the valve stem.

The examiner held that, in so far as the 1923 model and test was concerned, the evidence establishes that appellants did not regard it as satisfactory, and upon the entire record the examiner concluded that the construction and operation of that model was merely an abandoned experiment.

We are in accord with this holding, and are further of the opinion that there was no sufficient corroboration of appellants' testimony that the model operated successfully, even if the testimony of appellants should be construed to the effect that the model did operate successfully.

Appellant Arthur J. Fausek testified that in the summer of 1925 a regulator embodying all of the elements of the count was constructed, which was successfully operated from time to time until the date of appellants' application here involved, viz., November 28, 1930. Said model was produced by appellants and offered in evidence as "Fausek & Fausek Exhibit No. 3." Said Arthur Fausek further testified that, in so far as the elements of the count in issue are concerned, Exhibit 3 was in the same condition when offered in evidence as it was when originally constructed. The exhibit shows that the head of the valve stem is imperforate.

Appellant Irwing F. Fausek corroborated the testimony of Arthur Fausek with respect to the construction and operation of Exhibit 3, except that it was his (Irwing F. Fausek's) recollection that Exhibit 3 was constructed and operated in 1926. He fixes this year by the fact that on June 24, 1926, appellants filed another application for a patent (which application is not material here), and that experimental work with Exhibit 3 was carried on just prior to filing said application. Whether Exhibit 3 was constructed in 1925 or 1926 is not important, for appellee's conception of the invention did not occur until 1928.

The only testimony in the case tending to corroborate the testimony of appellants that Exhibit 3 was successfully operated, and hence constituted an actual reduction to practice of the invention, is that of the witness Kessel, a machinist employed by the Modern Engineering Co. He testified in part as follows:

"Q. 13. I call your attention to a regulator which has been introduced in evidence here and marked Fausek and Fausek Exhibit No. 3, and ask you if this is the regulator which you saw at that time. A. That regulator, or the rear end of it, is the one I put gauges on for test work, as far back as 1926; in the front of the building, when I first put gauges on that regulator.

"Q. 14. You stated you first saw it in 1927. A. That was the valve; I got acquainted with the valve; the regulator itself I seen in 1926.

"Q. 15. Then, you saw the exterior of the regulator in 1926? A. The exterior was on my bench for testing, in 1926.

"Q. 16. And you saw the inside in 1927? A. 1927.

"Q. 17. Do you recall the construction of the check valve which you saw in that regulator in 1927? A. The only thing I seen was when they took off the cap I noticed this little point (indicating stem of check valve).

"Q. 18. Did you see the head of the valve at that time? A. It was only the point, this point of the valve, this little release.

"Q. 19. You did not unscrew the nozzle of the regulator? A. I didn't take it out. * * *

"Q. 25. Did you ever see the regulator which you examined in 1926 and 1927 operated? A. In 1927 was when I seen the check valve operated, but I knew it was in there.

"Q. 26. Was there anything in the operation of this regulator which would indicate to you, as an experienced man in connection with regulators, whether or not there was a bleeding port in the check valve? Do you follow me on that? A. Yes, sir, what I have seen of the regulator in operation, the valve that was in there closed tight. * * *

"Q. 30. From your experience with regulators, would you say that if the check valve had a bleeding port in it there would be a hissing sound of some sort resulting from the passage of gas through the bleeding port? A. A bleeding port in a check valve can plainly be heard coming through.

"Q. 31. Did you hear any such sound as that when this regulator of 1926 and 1927 was operated? A. There was no sound that I noticed."

■ In view of this testimony, which shows that the witness did not know from visual observation whether or not the head of the valve stem was imperforate, we do not think that the testimony of appellants respecting the successful operation of Exhibit 3 was sufficiently corroborated, and without such corroboration the test of Exhibit 3 cannot be held to be a reduction to practice of the invention. Janette v. Folds et al., 38 F.2d 361, 17 C.C.P.A. (Patents) 879.

Appellant Irwing F. Fausek further testified that Exhibit 3 had been kept in storage the greater part of the time since its construction.

The Examiner of Interferences in his statement said that it was significant that none of the witnesses on behalf of the appellants testified that the large number of regulators manufactured and put upon the market by the Modern Engineering Company were equipped with nozzle safety valves of the imperforate type defined in the counts, and said examiner held that, upon the entire record, the evidence was insufficient to establish said Exhibit 3 as a reduction to practice of the invention embraced in the count, and that it, like the model constructed in 1923, should be regarded as an abandoned experiment. The Board of Appeals expressly approved this finding of the Examiner of Interferences.

With these findings the conclusion of the Patent Office tribunals followed that, although appellants were the first to conceive the invention, they were the last to reduce it to practice and were lacking in diligence in that regard from immediately prior to appellee's conception up to November 28, 1930, when appellants filed their application.

■ We think that upon the record the Patent Office tribunals were justified in so holding, and the decision of the Board of Appeals should be affirmed.

Appellants make two further contentions which we will briefly comment upon. In the brief of appellants we find the following:

"3. Successful operation of a later device raises a strong presumption that an earlier device was practically operative where both devices are substantially identical." United Shoe Machinery Co. v. Greenman (C.C.A.) 153 F. 283.

"In accordance with this holding Vincent's reduction to practice raises a strong presumption that the substantially identical, earlier structure of Fausek and Fausek was practically operative and renders unnecessary proof of reduction to practice by Fausek and Fausek."

■ It would be a strange doctrine indeed if it should be held that the diligence of one party in reducing an invention to

practice should inure to the benefit of his opponent, with whom he is not in privity.

Appellants make another contention, that the construction of the involved device is such that it must necessarily operate successfully, and therefore no tests were required to constitute a reduction to practice.

It is a sufficient answer to this contention to call attention to the fact that a model which appellants testified embodied the invention was tested by them in 1923, and its operation was found so unsatisfactory that the device was changed by making the head of the valve stem perforate, instead of imperforate as called for by the count before us.

For the reasons stated herein, the decision of the Board of Appeals is affirmed.

Affirmed.