**MIESSNER et al. v. HOSCHKE et al.**

No. 7962.

United States Court of Appeals for the District of Columbia.

Decided Nov. 2, 1942.

Mr. Clifton V. Edwards, of New York City, with whom Mr. Spencer B. Michael, of Washington, D. C., was on the brief, for appellants.

Mr. Daniel H. Kane, of New York City, of the Bar of the State of New York, pro hac vice, by special leave of Court, with whom Mr. Harry E. Seidel, of Washington, D. C., was on the brief, for appellees.

Before STEPHENS, VINSON, and EDGERTON, Associate Justices.

VINSON, Associate Justice.

An appeal has been taken from a judgment of the District Court dismissing an action instituted by appellants to review, under Section 4915 of the Revised Statutes,[1] a decision of the Patent Office in an interference proceeding,[2] wherein priority of invention was awarded appellees. In the interests of clarity, the appellants, as well as Miessner, through whom their rights are derived, will be referred to as Miessner; and the appellees, as well as Hoschke, through whom their rights are derived, will be referred to as Hoschke.

The invention involved is a development in the field of electronic musical instruments, a device whereby the reproduction of tones is effected by means of a free vibrating reed forming one of the plates of the condenser in a microphone circuit. This reed responds to suction by vibrating

---

[1] 35 U.S.C.A. § 63.

[2] Patent Interference No. 71,788.

at its natural frequency, thereby creating a corresponding frequency in the condenser, which, in turn, causes a concordant variation in the voltage across the condenser. The variation is then communicated to the in-put of an amplifier and a loud speaker, causing the reproduction of a musical note identical with that of the reed. The subject matter of the interference is embodied in two counts,[3] which, it will suffice to say, are differentiated upon the basis of the adjustability of the second plate of the condenser.

On April 6, 1934, Hoschke applied for a patent upon this device. On December 19, 1934, Miessner filed a similar application. The Patent Office granted Hoschke a patent[4] on September 17, 1935, and then declared an interference between the new patent and the pending Miessner application.[5] Hoschke established the earlier conception,[6] the earlier filing date, and a reduction to practice at least in December, 1933. It devolved upon Miessner, therefore, as the junior party, to establish a prior reduction to practice.

Miessner relied upon the effect of his performance of a certain test, and he offered in evidence his Exhibit 3, which he claimed was used in that test. The date of the test is a matter of dispute. Miessner testified that it was performed in October, 1933, but of his two witnesses, one set the date in December, the other, in February of the following year. In any event, Exhibit 3 is an adaptation of an ordinary musical pitch pipe with certain conversions, and Miessner testified that he constructed and operated this pitch pipe with an electrostatic pick-up and connected it to the amplifier of an electric piano within the dates specified. Admittedly, however, Exhibit 3 remained in the sole and exclusive custody of Miessner from the date of the alleged test until this interference was declared. To give this test the effect of a reduction to practice, therefore, Miessner is compelled to establish by a preponderance of the evidence at least (1) that Exhibit 3 was the very pitch pipe used in the test, and (2) that, *when used in the test,* this pitch pipe constituted an electrostatic condenser.

The testimony of Miessner as to the test tends to establish his position, but it requires more than the inventor's testimony to show reduction to practice. It is fundamental that his testimony, however clear, must be corroborated upon this point.[7] So the issue is narrowed to an inquiry as to whether the evidence presented was sufficient to corroborate Miessner's testimony that there was a reduction to practice of the device described in the interference counts.

Miessner produced notes and diagrams as part of his regular laboratory entries, and urges them as corroborating evidence. While this evidence may be of considerable moment in determining the issue of conception, we are of the opinion that it does not in itself prove the critical issue, namely, reduction to practice.[8] In Collins v. Olsen,[9] the court said:

"We must conclude that statements in reports by Olsen, no matter how clear, as to what he used, what he did and what the results were, cannot be accepted *as proof of reduction to practice,* unless fully corroborated * * *. While they constitute good evidence of conception, they are self-serving on the question of reduction to practice. * * *" [Italics supplied.]

The testimony of Miss LaRocca, a part-time stenographer employed by Miess-

---

[3] Count 1. In a musical instrument, a microphone circuit having a condenser, said condenser consisting of a reed secured at one end, the remaining portion of the reed being free for unrestricted vibration, said reed forming one plate of the condenser and a second plate in inductive relation with respect to the reed.

Count 2. In a musical instrument, a microphone circuit having a condenser, said condenser consisting of a reed secured at one end, the remaining portion of the reed being free for unrestricted vibration, said reed forming one plate of the condenser, and a second plate adjustable with respect to the reed for varying the capacitance of the condenser.

[4] Patent No. 2,015,014.

[5] No. 71,788, declared November 21, 1935.

[6] The Board of Appeals affirmed the findings of the Examiner of Interferences that Hoschke had established conception in April, 1928, and that Miessner had established conception at least by October 6, 1932.

[7] Petrie v. De Schweinitz, 1902, 19 App. D.C. 386.

[8] Collins v. Olsen, 1939, 102 F.2d 828, 26 C.C.P.A. Patents, 1017; Crane v. Carlson, Cust. & Pat.App.1942, 125 F. 2d 709.

[9] 1939, 102 F.2d 828, 831, 832, 26 C.C. P.A., Patents, 1017.

ner, is relied upon for corroboration. It is undisputed, however, that she did not examine the pitch pipe, that she did not know how it was constructed or how it operated, and that she had no mechanical or electrical knowledge whatsoever. This evidence is of insufficient corroborative value.[10]

Then there is the testimony of Jacobs, a witness of the test, upon which Miessner places much weight. Jacobs testified that although he had not assisted in the conversion of the pitch pipe and was unable to see the inside of the pitch pipe at the time of the test, or at any time until after the interference proceeding was declared, he was nevertheless certain, as an expert, that the construction of the pitch pipe would not have admitted of any other type of internal arrangement than the electrostatic type in question. Jacobs was equally certain, from many small enumerated evidences, that the riveted pitch pipe was the identical pipe that was affixed to the instrument during the test.

The Examiner of Interferences attached especial significance to this expert eye-witness testimony, and considered it "obvious that the pitch pipe structure constituted an electrostatic condenser since it is highly improbable that it would have operated otherwise." The Examiner of Interferences, thereupon, declared that it was satisfactorily established that Miessner had a successful reduction to practice at least by December 15, 1933.[11]

The Board of Appeals, however, while it recognized the Miessner test as constituting a reduction to practice of *some* device, overruled the Examiner of Interferences, and held that the evidence did not sufficiently prove that this device was the same as Exhibit 3, declaring that "some other electrical means could have been employed" during the test, and that, in any case, it had by no means been demonstrated that the pitch pipe structure constituted an electrostatic condenser.

Miessner urges here that the additional evidence offered in the District Court re-

moves any lingering doubt that he had made use of something other than an electrostatic, condenser or pick-up. Jacobs there testified for the first time that the pick-up in the. pitch pipe tested could not possibly have been magnetic (as distinguished from electrostatic) because the reeds in the pipe were brass and thus could not offset the magnetic field so as to cause pick-up action; that an electromagnetic pick-up (assuming that there was space enough in the device to hold it, which there was not) could not have been introduced into the device without removing one or both eyelets; that the device which he saw tested was put together with eyelets which had not been tampered with; that during the test he heard a loud clatter from the loud speaker, which phenomenon was exclusively characteristic of electrostatic pick-ups; and that these and other conclusions proved to his expert mind that it was an electrostatic pick-up.

The testimony of Jacobs did not constitute corroboration. Jacobs, at the time of the test, did not see the interior of the pitch pipe and did not know from visual observation what the internal construction of the pitch pipe was. The Board of Appeals and the District Court did not conclude that the pitch pipe was so constructed that no other arrangement was possible. As a matter of fact, the Board of Appeals expressly held *contra,* and the District Court ruled: "I am not satisfied that this pitch pipe was constructed and operated at the time which Miessner contends. Apart from the discrepancy of the testimony of the witnesses as to the time of its operation, the only evidence as to its real construction and the manner of its operation is that of Miessner himself."

The Board of Appeals and the District Court have determined that the testimony of Jacobs did not amount to corroboration of the Miessner testimony as a matter of law. The failure of visual observation as a basis of rejection could, of course, be carried to an extreme, but upon principle

---

[10] Brydle v. Honigbaum, 1931, 54 F.2d 147, 19 C.C.P.A., Patents, 773; Janette v. Folds et al., 1930, 38 F.2d 361, 17 C.C. P.A., Patents, 879.

[11] The Examiner of Interferences determined that Miessner was the inventor in respect of Count 1, but upon a finding that Hoschke, as the prior conceiver, had

exercised due diligence toward the subject matter of Count 2, determined Hoschke to be the inventor in respect of that Count. The Board of Appeals reversed the Examiner as to Count 1, and awarded priority to Hoschke upon both counts. The latter award was sustained by the District Court. Count 1 only is involved here.

and authority, it cannot be said that it has been so done in this instance.[12]

In Fausek v. Vincent,[13] the inventors' testimony was supported by their skilled mechanic, Kessel. It appeared that Kessel had not seen the head of the check valve employed in the alleged test, only the point, but testified that he knew the head was of a certain type because as a man experienced with regulators he would have known if it were otherwise, as a hissing sound of some sort would have resulted, and that he noticed no such sound. The question there was whether or not the head of the valve stem was perforate. The court held:

"In view of this testimony, *which shows that the witness did not know from visual observation* whether or not the head of the valve stem was imperforate, we do not think that the testimony of appellants respecting the successful operation of Exhibit 3 was sufficiently corroborated, and without such corroboration the test * * * cannot be held to be a reduction to practice of the invention. * * *" [Italics supplied.]

In the District Court additional evidence was offered in behalf of Hoschke. In May, 1936, some six months after the interference was started, Miessner presented a paper entitled "Electronic Music and Instruments", in which the statement appears that "The most recent developments in this country are the electronic organs using wind-blown harmonium reeds. One such, *the work of Hoschke*,[44] has been placed on the commercial market by the Everett Piano Company." [Italics supplied.] Footnote 44 of the paper reads: "F. A. Hoschke, Patent 2,015,014", and this is the very Hoschke patent in controversy. The paper, published in "The Institute of Radio Engineers" in November, 1936, continues with a description of the Hoschke development in terms of the subject matter of the counts of this interference.[14]

Appellees urge that this paper constitutes an admission by Miessner that the invention is Hoschke's. Miessner offered no testimony in explanation of the statement. In his brief here, he argues that the article did not discuss the "relative claims of inventorship," and that, in fact, at the date of the paper, as well as before, he was actively prosecuting his case in this interference. We are inclined to the idea that it is an admission against interest, and it may have been so considered by the District Court in its evaluation of Miessner's testimony in respect of the test made by him. In our view, however, that the Miessner testimony stands, as a matter of law, uncorroborated, we do not find it necessary to enter the effects of his admission into the equation.

The judgment is

Affirmed.

12 Akers v. Papst, 1940, 113 F.2d 136, 27 C.C.P.A., Patents, 1400; Fausek v. Vincent, 1937, 92 F.2d 909, 25 C.C.P.A., Patents, 770. See Crane v. Carlson, Cust. & Pat. App. 1942, 125 F.2d 709; Van Auken v. Cummings, 1931, 49 F.2d 490, 18 C.C.P.A., Patents, 1250; Janette v. Folds et al., 1930, 38 F.2d 361, 17 C.C. P.A., Patents, 879.

13 1937, 92 F.2d 909, 913, 25 C.C.P.A., Patents, 770.

14 The paper goes on: "It follows the usual reed and pipe organ design with one bank of reeds for each timbre, and with pneumatic coupling devices for blowing more than one reed with a given key; that is, for introducing octaves, mixtures, and so forth. *Electrostatic pickup is used for translating the reed vibrations into alternating voltages* which are amplified and reproduced. A larger model, having two manuals and pedal board, has just been announced. This is shown in Fig. 14." [Italics supplied.]