**MONTGOMERY et al. v. MARZALL.**

**No. 10655.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 21, 1950.

Decided March 29, 1951.

W. Brown Morton, New York City, with whom Clarence M. Fisher, Washington, D. C., was on the brief, for appellants.

H. S. Miller, United States Patent Office, Washington, D. C., with whom E. L. Reynolds, Solicitor, United States Patent Office, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, FAHY and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

This is a patent case. A complaint filed under R.S. § 4915, 35 U.S.C.A. § 63, by William J. Montgomery, the inventor, and The Champion Paper and Fibre Company, his assignee, was dismissed by the United States District Court for the District of Columbia. The court held the claims in issue, which have to do with an improvement in the manufacture of "cast coated" paper, are vague and indefinite at the precise point of novelty, and fail to point out the invention with the distinctness contemplated by R.S. § 4888, 35 U.S.C.A. § 33. We are asked to reverse that ruling.

Coated paper is that which has on one or both surfaces a layer of material other than paper which improves its appearance and makes it more suitable for printing. In the manufacture of such paper prior to the invention here involved, the coating composition was applied to the surface of the paper and was then air dried, after which the surface was calendered by running the coated paper between rollers which polished the surface to the extent desired.

Some years ago The Champion Paper and Fibre Company developed a new process which it called "cast coating." It placed the surface of the paper, wet with the coating material, against the surface of a large heated chromium-plated drum to which the wet paper adhered. As the drum revolved, the water in the coating material evaporated and, when the material was sufficiently dry, the paper no longer adhered to the drum and could be led away to the winding rolls. It is not necessary to calender cast coated paper because it remains in contact with the polished surface of the drum until the coating material is dry, as a result of which the coated paper has the luster of the drum surface.

There was one weakness in the new process: when the coating composition had dried, the coated paper did not always immediately disengage itself from the casting surface. When it did not, particles of coating gradually began to stick to the drum surface, damaging the quality of the paper and roughening the surface of the drum so that it was necessary to shut down the machine and thoroughly clean the drum surface before operation could be resumed.

Montgomery found by experimentation that if the drum surface carried a film of oil so thin that it could not be detected even

by rubbing the surface with a clean cloth, the dry coating would not stick to the drum but the wet coating would adhere long enough to give the proper finish to the coated paper. The film of oil requisite for this result was obtained by adding to the coating composition itself a small quantity of oil. The quantity of oil required to be added to the coating composition in order to form an infinitesimal film on the drum is necessarily small, and the exact quantity is determined by the skilled operator who watches the point at which the paper leaves the drum surface, and increases or decreases the percentage of oil in order to maintain the "cracking-off" point at the proper place, so that adherence to the drum will continue long enough but not too long.

By the practice of this method, The Champion Paper and Fibre Company has been able to maintain its cast coated process in continuous operation without stopping to clean the drum surface as had been necessary under the old method.

In his specification Montgomery said:
"* * * I have, however, further discovered that if, instead of attempting to apply oil directly to the casting surface, oil is incorporated into the aqueous fluid coating material, this alone will serve to maintain the oil film on the casting surface. * * * I have still further discovered that by properly regulating the amount of oil incorporated into the coating material I can control the thickness of the film so that the desired results can be continuously secured.

"It may be noted that the actual thickness of the required film is completely unknown and it may vary considerably with different oils. The thickness is infinitesimal * * *. The only gauge of its thickness and the only convenient proof of its presence is, in this case, the result obtained. * * * Thus in practical operation the oil content of the coating is adjusted in accordance with the results obtained without regard to any theoretical consideration as to the presence or thickness of a film on the casting surface."

In other words, Montgomery claims invention because he adds the step of putting a small quantity of oil in the coating composition just before it is applied to the paper. He says the percentage varies for many reasons. One of them is the difference in oils; some oils are effective and some are relatively ineffective. Another is the type of casting surface, as different metals require different amounts of oil to insure satisfactory operation. The temperature of the drum and its speed of rotation are important variables. The type, condition and moisture content of the paper used are significant factors. It is, therefore, necessary to have an expert observe the "cracking-off" point. If the coated paper loosens from the casting surface before the coating has dried adequately, the proportion of oil is too high. If the coated paper tends to stick to the casting surface after the drying is complete, the proportion of oil in the coating material is too low. So, when the cracking-off point moves one way or the other, the operator must increase or reduce the percentage of oil in the coating composition.

As we have said, many varying factors and conditions cause variation in the exact proportion of oil necessary to successful operation, some of which may change while the process is in progress, so requiring adjustment by the alert operator.

The specification gave eight examples of use, in each of which the oil was not more than one per cent of the weight of the coating composition. The Patent Office allowed Claim 26 which described the process as consisting of

"* * * applying * * * oil in an amount in the order of one-tenth to one percent of the weight of the coating composition, * * * the amount of said oil being such as to maintain on said casting surface, by adsorption thereon, a film of oil of a thickness insufficient to prevent adhesion of the coating composition to the casting surface until the coating composition is substantially dry."

But, the Patent Office and the District Court rejected Claims 31, 32 and 33, which describe the process but do not expressly say what percentage of oil should be used; thus Claim 31 describes it this way:

"* * * the improvement which comprises incorporating in the coating composition prior to its application to the paper a film-forming oil, and so adjusting the proportion of said film-forming oil in the coating composition that, in continued operation, the coating adheres to the casting surface until non-plastic and thereafter upon further drying becomes non-adherent."

The District Court's conclusion of law that the claims in issue are vague and indefinite at the precise point of novelty and fail to point out the invention with the required distinctness was based on the fact that the claims do not specify the proportion of oil to be added but leave that to be adjusted by the skilled operator.

Claim 26, which was allowed, specifies that there shall be added to the coating composition "oil in an amount in the order of one-tenth to one percent of the weight of the coating composition." But, even under the allowed Claim 26, the exact proportion of oil is not specified but must be regulated by the skilled man who observes the operation, since Claim 26 says the amount of oil must be "such as to maintain on said casting surface, by adsorption thereon, a film of oil of a thickness insufficient to prevent adhesion of the coating composition to the casting surface until the coating composition is substantially dry."

William J. Montgomery was the only witness. The following is quoted from his testimony:

"Q. In your commercial operations do you use more than one per cent of oil? A. Not at present.

"Q. Well, is one per cent of oil the maximum amount that can be used in the coating and still satisfactorily carry out the process described in the application? A. No.

\* \* \* \* \* \*

"Q. Could you manufacture cast-coated paper, such as is exemplified by this exhibit, according to your process by using more than one per cent of oil? A. It is my opinion that we could, based on laboratory results, a number of which where [sic]

we have successfully made sheets with well over one per cent, and some commercial experience where we have been slightly over one percent.

"Q. That is, by selection of these variable factors that you enumerated you could select conditions which would require more than one per cent of oil to carry out the process, is that correct? A. That is correct.

"Q. But according to your commercial procedure, it is less than one per cent because more than that is not necessary, is that correct? A. That is correct."

Uncontradicted evidence showed, therefore, that one per cent is not the maximum proportion of oil which can be used. Yet the District Court restricted the coverage of the patent to that percentage. The court found as a fact that "The novelty resides in the addition of oil to the coating composition as one of the steps of that process." The case was decided, however, as though the finding had been: "The novelty resides in the addition of *not more than one per cent* of oil to the coating composition as one of the steps of that process." The court seems to have regarded the step of adding oil as not in fact a true "step" in a method claim unless a floor and ceiling were fixed on the small amount to be added. This may have been due to confusion caused by the Bradner patent, to which we refer later.

It is apparent, we think, that the hinge upon which the decision of the District Court turned was its conclusion of law No. 3, which follows:

"* * * In the claims at bar, the step of 'adjusting the proportion of said film-forming oil * * *' is dependent upon the result desired, rather than the result being dependent upon the step."

This is a finding of fact,—not a conclusion of law. From it flowed the decisive conclusion of law that the claims are vague and indefinite at the precise point of novelty and so fail to point out the invention with the distinctness required by the statute. If this finding of fact [conclusion of law] is incorrect, it follows

that the court erred in its legal conclusion.

The specification and Montgomery's testimony make it clear that the result desired is dependent on the step of adjusting the proportion of the film-forming oil in the coating composition. Unless this adjustment is made and maintained the dry coated paper will either stick to the casting surface or will not have a cast surface. The fact that the degree of adjustment required is best measured by its effect on the result does not make the result any less dependent on the adjustment.

A similar attack was made upon certain claims in Proctor & Gamble Mfg. Co. v. Refining Inc., 1943, 135 F.2d 900, 906. It was said the claims merely stated the results to be achieved. The Court of Appeals for the Fourth Circuit said:

"The defendant seeks to apply these decisions [General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232] to the pending case by pointing out a lack of definiteness in the claims. For example, claim 2 describes a continuous refining process which includes passing the mixture through a heated conduit to raise its temperature to a degree which would facilitate centrifugal separation without specifying the precise degree of temperature; and claim 9 describes a quick continuous refining process which includes mixing measured quantities of oil and alkali 'for a brief period to effect substantial neutralization of the free fatty acid contained in the oil and to form soap stock.' It is contended that by reason of these omissions, the claims become merely descriptive of the desired function.

"This argument, we think, misconceives the nature of the claims in suit. They do not state merely the results to be achieved but are process claims which set out a series of steps by which the desired ends are attained with sufficient definiteness to inform persons skilled in the art and to limit the extent of the monopoly of the patent. It was not necessary or practicable for Clayton to specify the exact degree of emulsion breaking temperature or the precise length of time needed for the substantial neutralization of every quality of oil that might be subjected to refinement; and the evidence shows that the information given was entirely adequate to persons skilled in the art. That such a description is sufficient is shown in Smith v. Snow, 294 U.S. 1, 7, 55 S.Ct. 279, 79 L.Ed. 721, wherein a claim relating to incubation of eggs was sustained although it spoke only in general terms of the size of openings for ventilation and the velocity and temperature of a current of air to be employed in the patented method. See, also, Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733; Gulf Smokeless Coal Co. v. Sutton, 4 Cir., 35 F.2d 433; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F. 2d 178; Catalin Corporation of America v. Catalazuli Mfg. Co., Inc., 2 Cir., 79 F.2d 593."

In like manner, the Patent Office tribunals and the District Court have in this case mistaken the nature of the claims in issue. They are true process claims, in that they describe the acts to be done in manufacturing cast coated paper, including new steps added by appellants to the previously practiced process. The claims are not for the compounding of ingredients into a new product, nor are they for a manufactured article the characteristics of which are caused or affected by the materials of which it is made. That is to say, these are not claims for compounding a new coating composition by adding a specified proportion of oil. The coating composition is the same as before. The small quantity of oil is added just before use, not to change the nature of the coating composition, but to obtain and maintain a definitely described operating condition. Due to the variables, some of which we have mentioned, the quantity of oil to be added does not remain constant but must be changed frequently as the process proceeds.

Thus the invention lies, not in adding a fixed quantity of oil, but in the use of oil

644

to lubricate the drum surface,—in adding the quantity which is observed to be necessary. It is clear that the addition of a small amount of oil is a step in the process of manufacture. Observing the cracking-off point and regulating the quantity accordingly are additional steps.

We turn to the Bradner patent, No. 1826726, which was mentioned in argument and in the District Court's findings and which may have influenced the decision. Bradner's invention had no relation to the manufacture of cast coated paper. It was an improvement in the old method which was in use before the cast coating process was developed. In the former practice, the wet coating composition was allowed to dry in the air, after which the paper was calendered. If the composition were foaming when applied to the paper, the bubbles burst during air-drying and caused "pin holes" which damaged the quality of the product. Bradner added pine oil and sulphonated castor oil to the coating composition to reduce foaming.

Cast coated paper is neither air-dried nor calendered. The wet paper is rolled tightly against the surface of the heated drum and is there dried, with the result that foaming does not constitute the problem which it was in the air-drying method. This was recognized in finding of fact No. 3 in which it was said, "The quantity and character of oil effective to reduce foaming has no relation to the quantity and character of oil required for the practice of the process claimed."

Yet the Commissioner of Patents said in his brief, "In the case at bar, the use of oil in coating material for paper is old." Quite to the contrary, "In the case at bar," the use of oil in the coating material for cast coated paper is new. Indeed, the District Court so found by saying, "The novelty resides in the addition of oil to the coating composition as one of the steps of that process."

The inconsistency of allowing Claim 26 and rejecting the three claims in dispute should be pointed out. We have shown that Claim 26 stipulates the use of oil—not in a fixed proportion—but in a range

from one-tenth to one per cent, the percentage being adjusted when necessary as the result is observed. The Patent Office and the District Court found no fault with that claim, of which it could have been said equally well as of the rejected claims that "the step of 'adjusting the proportion of * * * oil * * *' is dependent upon the result desired, rather than the result being dependent upon the step."

■ It is our view that the decisions of the Patent Office tribunals and the District Court are so clearly erroneous that the strong presumption of their correctness is overcome. We find strikingly appropriate the following quotation from Proctor & Gamble Mfg. Co. v. Refining, Inc., supra:

"There are many situations in the practice of the arts in which specific directions are properly omitted from the claims of patents because greater definition is either impracticable or is unnecessary to inform the art, and would serve only unduly to limit the scope of the invention or to invite evasion by those who desire wrongfully to misappropriate the substance of the invention", and this excerpt from Chadeloid Chemical Co. v. Wilson Remover Co., 2 Cir., 1915, 224 F. 481, 484:

"* * * It was not necessary or wise to specify the exact proportion of wax, as this differs according to the work being done. Had the exact percentage been named, anyone could evade the patent by using more or less than the specified amount and thus could have secured all the advantages of the invention without the payment of a dollar."

■ The only defense presented by the answer of the Commissioner of Patents was that the claims in issue do not describe the process definitely enough to meet the requirements of R.S. § 4888, 35 U.S.C.A. § 33. We hold solely that the claims were sufficiently definite, and express no opinion concerning any other question which might have been raised.

The case will be remanded for the entry of a judgment authorizing the Commissioner of Patents to allow Claims 31, 32 and 33.

Reversed.